**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| LUCAS CRANOR, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 4:18-CV-00628-FJG |
| v. | ) ) | |
| THE ZACK GROUP, INC., | ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF'S RULE 26(a)(2) EXPERT DISCLOSURE**

Pursuant to Fed. R. Civ. P. 26(a)(2), Plaintiff Lucas Cranor discloses the following person whom he may use to present expert testimony:

> Jeffrey A. Hansen
> Spring Valley, CA 91977
> (619) 270-2363
> Email: Jeff@TCPAwitness.com

Qualifications: The Written Report of Jeffrey A. Hansen, attached as **Exhibit 1**, illustrates his qualifications. Mr. Hansen's qualifications are also set forth in his resume, attached to that report as Exhibit A.

Other Cases: A list of all other cases in which Mr. Hansen has testified or given evidence as an expert at trial or at deposition during the previous four years is included in his report and his resume attached to that report as Exhibit A.

Compensation: Mr. Hansen's fee in this case is $300 per hour for services rendered and $380 per hour for testimony.

Plaintiff makes this disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2) based upon information reasonably available to him at this time and reserves the right to supplement this disclosure pursuant to the Federal Rules of Civil Procedure and Orders of the Court.

Dated: June 7, 2019

Respectfully submitted,

LUCAS CRANOR, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiffs

By:  /s/ Theodore H. Kuyper 

Keith J. Keogh (Pro Hac Vice)
Theodore H. Kuyper (Pro Hac Vice)
KEOGH LAW, LTD.
55 W. Monroe St., Suite 3390
Chicago, IL 60603
(312) 726-1092
(312) 726-1093 (fax)
keith@keoghlaw.com
tkuyper@keoghlaw.com

A.J. Stecklein (#16330)
Michael H. Rapp (#25702)
Stecklein & Rapp, Chartered
748 Ann Ave.
Kansas City, Kansas 66101
(913) 371-0727
(913) 371-0147 (fax)
aj@kcconsumerlawyer.com
mr@kcconsumerlawyer.com

***Attorneys for Plaintiff and the Putative Class***

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF MISSOURI**

**WESTERN DIVISION**

| | |
|---|---|
| | Case No.: 18-0628-CV-W-FJG |
| LUCUS CRANOR, individually and on behalf of himself and all others similarly situated, | |
| | **WRITTEN REPORT OF JEFFREY A. HANSEN** |
| *Plaintiff,* | |
| *v.* | |
| THE ZACK GROUP, INC., | 5427 |
| *Defendant.* | |

# EXPERT REPORT OF JEFFREY A. HANSEN

1.     My name is Jeffrey A. Hansen. I am an adult over the age of 18, a resident of the state of California, and I reside at 2625 Kings View Circle, Spring Valley, CA 91977. Unless indicated otherwise, I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

2.     I was asked to prepare this written expert report by Plaintiff's counsel in the above-captioned matter, Keogh Law, Ltd.

***3.***     I have been retained in this case at a rate of $300 per hour, for all services rendered, and $380 per hour for depositions.

***Experience and Credentials.***

4.     I am the principal of Hansen Legal Technologies, Inc. My firm is in the business of handling Information Technology, including investigations and analysis of electronic data. I have served as an expert or consultant in more than 150 TCPA class action lawsuits, and as an expert or consultant in hundreds of other civil cases.

5.     With regard to my experience as an expert and consultant in legal matters, generally, I have frequently served as an expert witness and consultant to law firms in conducting computer forensic analysis. I have also assisted in electronic discovery issues.

6.     Specific to this case, my firm was retained to assist Plaintiff's counsel in evaluating and analyzing the telephone dialing systems used by Defendant The Zack Group, Inc. ("The Zack Group") in sending SMS messages to Plaintiff. I have also been retained to assist Plaintiff and his counsel in evaluating and analyzing electronic data related to the SMS messages and other electronic data associated with computer systems and/or telephone dialing systems used by The Zack Group. In that respect, I have extensive experience with data warehousing, including data warehousing related to telemarketing and autodialers in general. I am familiar with the procedures involved in such practices, and I have personally engaged in data warehousing regarding the compilation of certain lists, including demographic and target audience lists for

---

telemarketing, and have personally repaired defective lists to eliminate improperly formatted and corrupted data.

7.      I also frequently act as a consultant to companies that engage in the use of autodialers, and I am familiar with their use and procedures, and the technical aspects of that business. In that capacity, I have assembled, configured, maintained, operated all aspects of autodialers, and interfaced with the telecommunications providers through whose networks the autodialers operate.

8.      I have set up and maintained all aspects of predictive dialers and autodialers, from predictive dialers operating with just three telephone lines to outbound call centers, run from three locations, capable of generating over 1 million calls per hour. When building these systems, I have used various software and hardware solutions for predictive and autodialers, both proprietary and open source, and customized those systems for their particular uses. I myself have used and maintained predictive and autodialers, and trained others to do the same.

9.      Further, I am familiar with the manner in which outbound dial lists are used and maintained in the call center industry. Similarly, I am familiar and have experience with, and know how to use, databases containing cell block identifiers and ported number lists, both of which identify cellular type telephone numbers and are typically used in these industries.

10.      Over the last twenty-nine (29) years, I have also had extensive experience in a broad range of other areas in the electronic and information technology fields and obtained many certifications such as MCP 4.0, A+, Network+, MCP 2000, MCSA, MCSE, Linux+, I-Net+, Security+, CIW Security Analyst.  From the hardware perspective, I have extensive experience in troubleshooting and repairing at the component level, and building various systems for various purposes. I have designed, built and maintained computer networks in a variety of environments from commercial businesses to very large Department of Defense networks. I have taught approximately 1,000 others the skills to become computer network engineers themselves.

3

11.    I have had extensive experience in dealing with security breaches and hardening computer networks against those breaches.  I have handled many computer forensic and E-Discovery matters, including internal investigations in companies, working at the FBI sponsored Regional Computer Forensics Laboratory, and founding a computer forensics and E-Discovery firm over 11 years ago.  I have also had extensive experience with the set-up and use of predictive and autodialers. (*See Exhibit A – Resume of Jeffrey A. Hansen*).

12.    I have been called to testify in the following civil matters: *Craig Casey v. Valley Center Insurance Agency Inc*., Case No. 37-2008-00004378-SC-SC-CTL (San Diego Superior Court); *Stemple v. QC Holdings, Inc*., Case No. 12-CV-1997-CAB-WVG (S.D. Cal.); *Hahn v. Massage Envy Franchisin*g, Case No: 3:12-cv-00153-DMS-BGS (S.D. Cal.); *Abdeljalil v. General Electric Capital Corporatio*n, Case No: 12-cv-02078-JAH-MDD (S.D. Cal.); *Jasminda Webb v. Healthcare Revenue Recovery Group, LLC* Case No: C 13-0737 JD (N.D. Cal.); *Balschmiter v. TD Auto Finance, LLC*, Case No: 2:13-cv-01186 (E.D. Wisc.)*; Jordan Marks v. Crunch San Diego, LLC*, Case No. 14-CV-0348-BAS (BLM) (S.D. Cal.); *Peter Olney v. Job.com,* Case No: 1:12-cv-01724-LJO-SKO (E.D. Cal.); *Carlos Guarisma v. ADCAHB Medical Coverages, Inc. and Blue Cross and Blue Shield of Florida, Inc*., Case No: 1:13-cv-21016-JLK (S.D. Fla.); *Farid Mashiri v. Ocwen Loan Servicing, LLC*, Case No: 3:12-cv-02838 (S.D. Cal.); *Monty J. Booth, Attorney at Law, P.S. v. Appstack, Inc*., Case No. 2:13-cv-01533-JLR (W.D. Wash.); *Rinky Dink, Inc. d/b/a Pet Stop v. World Business Lenders, LLC*, Case No. 2:14-cv-00268-JCC (W.D. Wash.); *Michael Reid and Dave Vacarro v. I.C. Systems, In*c., Case No. 2:12-cv-02661-ROS (D. Ariz.); *Jeffrey Molar v. NCO Financial System*s Case No. 3:13-cv-00131-BAS-JLB (S.D. Cal.); *Latonya Simms v. Simply Fashion Stores Ltd., and ExactTarget, Inc*., Case No. 1:14-CV-00737-WTL-DKL (D. Ind.); *Sueann Swaney v. Regions Bank*, Case No. CV-13-RRA-0544-S (N.D. Ala.); *Hooker v. SiriusXM*, Case No. 4:13-cv-00003 (AWA) (E.D. Va.); *Diana Mey v. Frontier Communications*, Case No. 13-cv-01191-RNC (D. Conn.); *Rachel Johnson v. Yahoo!*

and *Zenaida Calderin v. Yahoo! Case* No. 14-cv-2028 14-cv-2753 (N.D. IL); *Philip Charvat v. Elizabeth Valente*, Case No. 12-cv-5746 (N.D. IL); *Robert Zani v. Rite Aid Hdqtrs. Corp*., Case No. 14-cv-9701(AJN)(RLE)(S.D. NY), *A.D. v. Credit One Bank* Case No. 1:14-cv-10106 (N.D. IL); *Oerge Stoba, and Daphne Stoba v. Saveology.com, LLC, Elephant Group, Inc.; Time Warner Cable, Inc*., Case No. 13-cv-2925-BAS-NLS (S.D. Cal.); *Shyriaa Henderson v. United Student Aid Funds, Inc*. Case Number: 3:13-cv-1845-L-BLM (S.D. Cal.); *Marciano v. Fairwinds Financial Services* Case No. 6:15-CV-1907-ORL-41 KRS (M.D. Fla); *Alice Lee v. Global Tel\*Link Corporation*, Case No. 2:15-cv-02495-ODW-PLA [consolidated with 2:15-cv-03464-ODW-PLA (C.D. Cal.); *Alan Brinker v. Normandin's*, Case No. 5:14-cv-03007-EJD-HRL (N.D. Cal.); Spencer Ung v. Universal Acceptance Corporation, Case No. 15cv127 RHK/FLN (D. Minn); Seana Goodson v. Designed Receivable Solutions, Case No. 2:15-cv-03308-MMM-JPR (C.D. Cal); *Dominguez v. Yahoo!, Inc*., Case No. 2:13-cv-01887 (E.D. Penn); *Eli Ashkenazi v. Bloomingdales, Inc*., Case No. 3:15-cv-02705-PGS-DEA (D. N.J.); *Abante Rooter and Plumbing, Inc. v. Birch Communications, Inc*. Case No. 1:15-cv-03562 (N.D. GA); *Roark v. Credit One Bank*, Case No. 0:16-cv-00173-RHK-FLN (D.Minn); *Carl Lowe And Kearby Kaiser v. CVS Pharmacy, Inc., Minuteclinic, LLC, and West Corporation*, Case No. 1:14-cv-03687 (N.D. Ill); *Zaklit v. Nationstar Mortgage, LLC*., Case No. 5:15-CV-02190-CAS-KK (C.D. Cal); *Charles Banks v. Conn Appliance, Inc*., Case No. 01-16-0001-0736 (American Arbitration Association); *Rajesh Verma v. Memorial Healthcare Group*, Case No. 3:16-CV-00427-HLA-JRK (M.D. Fla); *Herrick v. Godaddy.com*, Case No. 2:16-cv-00254-DJH (D.AZ); *In Re: Monitronics International, Inc., Telephone Consumer Protection Act Litigation*, Case No. 1:13-md-02493-IMK-JSK (N.D.W.V.); *Diana Mey v. Ventura Data*, LLC And Public Opinion Strategies, Case No. 5:14-CV-123 (N.D.W.V.); *Lucero v. Conn Appliances*, Case No. 01-16-0004-7141 (American Arbitration Association); *Dennis v. Progressive Leasing*, Case No. 01-16-0002-8798 (American Arbitration Association – Final Hearing); *Shani Marcus and Frieda Esses Ashkenazi v. CVS Pharmacy, Inc*., Case No.: 3:15-cv-259

PGS-LHG (D. N.J.); *Donnell Webster v. Conn Appliances, Inc.*, Case No.: 01-16-0003-3774 (American Arbitration Association - Final Hearing); *Snyder v. Ocwen Loan Servicing*, Case No.: 1:14-cv-08461 (N.D. Ill); *Shamara Abrahams v. First Premier Bank*, Case No. 01-16-0003-8128 (American Arbitration Association - Final Hearing); *Wooten v. Conn Appliances, Inc.*, Case No.: 01-16-0003-5557 (American Arbitration Association – Final Hearing); *Sandra West and Hector Membreno v. California Service Bureau*, Case No.: 4:16-cv-03124-YGR (N.D. Cal.); *Summers v. Conn Appliances*, Case No.: 01-16-0004-1183 (American Arbitration Association - Final Hearing); *Sheena Raffin v. Medicredit*, Case No.: 2:15-cv-04912-GHK (C.D. Cal); *Verina Freeman and Valecea Diggs v. Wilshire Commercial Capital*, Case No.: 2:15-cv-01428-WBS-AC (E.D. Cal); *Tomeo v. Citigroup*, Case No.: 1:13-cv-04046 (N.D. Ill); *Douglas Jurist v. Receivables Performance Management, LLC*, Case Number 1240022589 (JAMS Arbitration); *April Turner v. Credit One Bank, N.A.*, Case No. 1440005239 (Arbitration Tribunals of JAMS - Final Hearing); *Frederick Luster and Narval Mangal v. Green Tree Serivicing. LLC*, Case No. 1:14-cv-01763-ELR (N.D. Georgia); *Jonathan Greisen v. Credit One Bank* (JAMS Arbitration); *Isaac Saucedo v. Credit One Bank* (JAMS Arbitration); *Naomi Blocker v. Credit One Bank* (JAMS Arbitration); *Winston Edwards III v. Credit One Bank*, Case No. 1260004354 (JAMS Arbitration); *Timothy Levis Johnson v. Credit One Bank* (JAMS Arbitration); *William Boden and Debra Boden v. Credit One Bank*, Case Nos: 1220054604/1220054605 (JAMS Arbitration – Final Hearing); *Rebecca Sanders v. Credit One Bank*, Case No.: 01-17-0001-6599 (American Arbitration Association - Final Hearing); *Donna Ace v. Credit One Bank* (JAMS Arbitration); *Lynette Alomar v. Credit One Bank* (JAMS Arbitration); *Tonya Anderson v. Credit One Bank* (JAMS Arbitration); *Gregory Andrews v. Credit One Bank* (JAMS Arbitration); *Alyce Baker v. Credit One Bank* (JAMS Arbitration); Terry Bardwell v. Credit One Bank (JAMS Arbitration); *Joshua Bare v. Credit One Bank* (JAMS Arbitration); *Lori Bason v. Credit One Bank* (JAMS Arbitration); *Christopher Batch v. Credit One* (JAMS Arbitration); *Tiffany Battle v. Credit One* (JAMS Arbitration); *Jean*

Case 4:18-cv-00628-FJG   Document 61   Filed 06/07/19   Page 9 of 39

*Bellingrodt v. Credit One Bank* (JAMS Arbitration); *Carolyn Bennett v. Credit One Bank* (JAMS Arbitration); *Shady Bennett v. Credit One Bank* (JAMS Arbitration); *Kelly Benson v. Credit One Bank* (JAMS Arbitration); *Dawn Berkey v. Credit One Bank* (JAMS Arbitration); *Sherry Best v. Credit One Bank* (JAMS Arbitration); *Daniel Blashack v. Credit One* (JAMS Arbitration); *Edith Blashack v. Credit One* (JAMS Arbitration); *Takia Brandon v. Credit One* (JAMS Arbitration); *Jeffrey Brown v. Credit One Bank* (JAMS Arbitration); *Karen Brown v. Credit One* (JAMS Arbitration); *Rebecca Burt v. Credit One Bank* (JAMS Arbitration); *Jennifer Burton v. Credit One Bank* (JAMS Arbitration); *Janice Bushey v. Credit One Bank* (JAMS Arbitration); *Matthew Byers v. Credit One Bank* (JAMS Arbitration); *Darrell Byrom v. Credit One Bank* (JAMS Arbitration); *Eric Carlstedt v. Credit One Bank* (JAMS Arbitration); *Ronald Carnes v. Credit One Bank* (JAMS Arbitration); *Michelle Carter v. Credit One Bank* (JAMS Arbitration); *Brandon Chapman v. Credit One Bank* (JAMS Arbitration); *Derek Chism v. Credit One Bank* (JAMS Arbitration); *Bernard Combs v. Credit One Bank* (JAMS Arbitration); *Linda Cooper v. Credit One Bank* (JAMS Arbitration); *Janice Crenshaw v. Credit One Bank* (JAMS Arbitration); *Christopher Crisona v. Credit One Bank* (JAMS Arbitration); *Brent Crompton v. Credit One Bank* (JAMS Arbitration); *Teresa Cruz v. Credit One Bank* (JAMS Arbitration); Lisa Currey v. Credit One Bank (JAMS Arbitration); *Kenneth Curtis v. Credit One Bank* (JAMS Arbitration); *Melissa Damron v. Credit One Bank* (JAMS Arbitration); *Mike Dane v. Credit One Bank* (JAMS Arbitration); *Ayanna Davis v. Credit One Bank* (JAMS Arbitration); *Bruce Davis v. Credit One Bank* (JAMS Arbitration); *Matthew Day v. Credit One Bank* (JAMS Arbitration); *Angela Deal v. Credit One Bank* (JAMS Arbitration); *Bettina Deleon v. Credit One Bank* (JAMS Arbitration); *Nathaniel and Rowena Depano v. Credit One Bank* (JAMS Arbitration); *Melissa Dibenedetto v. Credit One Bank* (JAMS Arbitration); *Juan Dillon v. Credit One Bank* (JAMS Arbitration); *Sarah Peacock v. Credit One Bank* (JAMS Arbitration); *Kristina Dorffer v. Credit One Bank* (JAMS Arbitration); *Michael Dorsey v. Credit One Bank* (JAMS Arbitration);

---

7

1  *Dacia Drury v. Credit One Bank* (JAMS Arbitration); *Kelly Dubel v. Credit One Bank*
2  (JAMS Arbitration); *Winston Edwards III v. Credit One Bank* (JAMS Arbitration);
3  *Kristi Evans v. Credit One Bank* (JAMS Arbitration); *Herby Fequiere v. Credit One*
4  *Bank* (JAMS Arbitration); *Patrick Fitch v. Credit One Bank* (JAMS Arbitration);
5  *Sharon Flowers v. Credit One Bank* (JAMS Arbitration); *Michelle Fong v. Credit One*
6  *Bank* (JAMS Arbitration); *Joy Williams Frazier v. Credit One Bank* (JAMS
7  Arbitration); *Carol Galanos v. Credit One Bank* (JAMS Arbitration); *Lizette Garcia v.*
8  *Credit One Bank* (JAMS Arbitration*); Olivia Garcia v. Credit One Bank* (JAMS
9  Arbitration); *Corey Gill v. Credit One Bank* (JAMS Arbitration); *Amy Goetting v.*
10 *Credit One Bank* (JAMS Arbitration); *Angel Gomez v. Credit One Bank* (JAMS
11 Arbitration); *Derik Gonzalez v. Credit One Bank* (JAMS Arbitration); *Moises Govea v.*
12 *Credit One Bank* (JAMS Arbitration); *Tonya Greer v. Credit One Bank* (JAMS
13 Arbitration); *Melissa Grose v. Credit One Bank* (JAMS Arbitration); *Laurie Guerrattaz*
14 *v. Credit One Bank* (JAMS Arbitration); *Scott Guntle v. Credit One Bank* (JAMS
15 Arbitration); *Arlinda Hairston v. Credit One Bank* (JAMS Arbitration); *Bartley Harper*
16 *v. Credit One Bank* (JAMS Arbitration); *Terrance Harris v. Credit One Bank* (JAMS
17 Arbitration); *Cindy Hawkins v. Credit One Bank* (JAMS Arbitration); *Daniel Hawkins*
18 *v. Credit One Bank* (JAMS Arbitration); *Tara Hicks v. Credit One Bank* (JAMS
19 Arbitration); *Theresa Hill v. Credit One Bank* (JAMS Arbitration); *Troy and Tammy*
20 *Hill v. Credit One Bank* (JAMS Arbitration); *Gary and Angela Hlavacek v. Credit One*
21 *Bank* (JAMS Arbitration); *Virginia Hubbell v. Credit One Bank* (JAMS Arbitration);
22 *Ashley Jackson v. Credit One Bank* (JAMS Arbitration); *Joseph James v. Credit One*
23 *Bank* (JAMS Arbitration); *Donald Johnson v. Credit One Bank* (JAMS Arbitration);
24 *Janet Johnson v. Credit One Bank* (JAMS Arbitration); *John Johnson v. Credit One*
25 *Bank* (JAMS Arbitration); *Sonya Johnson v. Credit One Bank* (JAMS Arbitration);
26 *Stephanie Johnson v. Credit One Bank* (JAMS Arbitration); *Kenneth Jones v. Credit*
27 *One Bank* (JAMS Arbitration); *Michael and Marianne Jordan v. Credit One Bank*
28 (JAMS Arbitration); *Robert Ketterman v. Credit One Bank* (JAMS Arbitration); *Leila*

8

Case 4:18-cv-00628-FJG   Document 61   Filed 06/07/19   Page 11 of 39

*Kier v. Credit One Bank* (JAMS Arbitration); *Samantha King v. Credit One Bank* (JAMS Arbitration); *Jessica Kirksey v. Credit One Bank* (JAMS Arbitration); *Angelica Korchmaros v. Credit One Bank* (JAMS Arbitration); *Yaroslav Kut v. Credit One Bank* (JAMS Arbitration); *Brad Larsen v. Credit One Bank* (JAMS Arbitration); *Sarah Lawhead v. Credit One Bank* (JAMS Arbitration); *Gary Lawrence v. Credit One Bank* (JAMS Arbitration); *Timothy Levis Johnson v. Credit One Bank* (JAMS Arbitration); *Kemisha Levy v. Credit One Bank* (JAMS Arbitration); *Benjamin Lewis v. Credit One Bank* (JAMS Arbitration); *Jackie Likovic v. Credit One Bank* (JAMS Arbitration); *Lorenzo Lockwood v. Credit One Bank* (JAMS Arbitration); *Cathy Loreto v. Credit One Bank* (JAMS Arbitration); *Dawn Lowery v. Credit One Bank* (JAMS Arbitration); *Issac Lowery v. Credit One Bank* (JAMS Arbitration); *Leslie Malina v. Credit One Bank* (JAMS Arbitration); *Torre Mason v. Credit One Bank* (JAMS Arbitration); *Michael McDevitt v. Credit One Bank* (JAMS Arbitration); *Maya Christian McKeever v. Credit One Bank* (JAMS Arbitration); *Linda McNeal v. Credit One Bank* (JAMS Arbitration); *Amanda McNeill v. Credit One Bank* (JAMS Arbitration); *James McPartland v. Credit One Bank* (JAMS Arbitration); *Janice Metzger v. Credit One Bank* (JAMS Arbitration); *Dawn and Anthony Mighaccio v. Credit One Bank* (JAMS Arbitration); *Adriane Miles v. Credit One Bank* (JAMS Arbitration); *Keith Miller v. Credit One Bank* (JAMS Arbitration); *Dixie Dawn Moore v. Credit One Bank* (JAMS Arbitration); *Sabrina Moore v. Credit One Bank* (JAMS Arbitration); *Estefany Morel v. Credit One Bank* (JAMS Arbitration); *Juan Moreno v. Credit One Bank* (JAMS Arbitration); *Michelle Morgan v. Credit One Bank* (JAMS Arbitration); *Darlene Morrison v. Credit One Bank* (JAMS Arbitration); *Bobbie Murray and Random Booth v. Credit One Bank* (JAMS Arbitration); *Charlene Myers v. Credit One Bank* (JAMS Arbitration); *Denise Myers v. Credit One Bank* (JAMS Arbitration); *Rebecca Naylor v. Credit One Bank* (JAMS Arbitration); *Sharon Neville v. Credit One Bank* (JAMS Arbitration); *Jessanna Nunnery (Mitchell) v. Credit One Bank* (JAMS Arbitration); *Anthony Ogline v. Credit One Bank, N.A. and Midland Funding, LLC* (JAMS Arbitration); *Agnes Ousley v. Credit One Bank*

(JAMS Arbitration); *Kaitlyn Peace v. Credit One Bank* (JAMS Arbitration); *Thomas Piner v. Credit One Bank* (JAMS Arbitration); *Melissa Prieto v. Credit One Bank* (JAMS Arbitration); *Heather Pyle v. Credit One Bank* (JAMS Arbitration); *Nathan Quick v. Credit One Bank* (JAMS Arbitration); *Nikola Radojkovic v. Credit One Bank* (JAMS Arbitration); *Jessica Rainey v. Credit One Bank* (JAMS Arbitration); *Tyrone Randolph v. Credit One Bank* (JAMS Arbitration); *Derek Reid v. Credit One Bank* (JAMS Arbitration); *John Reyes v. Credit One Bank* (JAMS Arbitration); *Rich Richardson v. Credit One Bank* (JAMS Arbitration); *Deborah Ristoff v. Credit One Bank* (JAMS Arbitration); *David Robertson v. Credit One Bank* (JAMS Arbitration); *Heather Robertson v. Credit One Bank* (JAMS Arbitration); *Ryan Romero v. Credit One Bank* (JAMS Arbitration); *Kathy Rupp v. Credit One Bank* (JAMS Arbitration); *Camilla Sammons v. Credit One Bank* (JAMS Arbitration); *Paul Schaferling v. Credit One Bank* (JAMS Arbitration); *Christopher Shirley v. Credit One Bank* (JAMS Arbitration); *Jerryd Shoda v. Credit One Bank* (JAMS Arbitration); *Martha Gabriela Silva Canales v. Credit One Bank* (JAMS Arbitration); *Jay Simon v. Credit One Bank* (JAMS Arbitration); *Melissa Simpson v. Credit One Bank* (JAMS Arbitration); *Delisa Sims v. Credit One Bank* (JAMS Arbitration); *Gween Sims v. Credit One Bank* (JAMS Arbitration); *Bridgette Fretz v. Credit One Bank* (JAMS Arbitration); *Christine Sokoloski v. Credit One Bank* (JAMS Arbitration); *Kyle Sorensen v. Credit One Bank* (JAMS Arbitration); *Paula Spivey v. Credit One Bank* (JAMS Arbitration); *Joshua Stack v. Credit One Bank* (JAMS Arbitration); *Anturuan Stallworth v. Credit One Bank* (JAMS Arbitration); *Rebecca Stanley v. Credit One Bank* (JAMS Arbitration); *Alisha Stewart v. Credit One Bank* (JAMS Arbitration); *Helen Stuber v. Credit One Bank* (JAMS Arbitration); *Pamela Swanson v. Credit One Bank* (JAMS Arbitration); *Shannon Taylor v. Credit One Bank* (JAMS Arbitration); *Angie Teneyck v. Credit One Bank* (JAMS Arbitration); *Stephanie Thornton v. Credit One Bank* (JAMS Arbitration); *Connie Tolbert v. Credit One Bank* (JAMS Arbitration); *Tamara Tuggle v. Credit One Bank* (JAMS Arbitration); *Leo Underhill v. Credit One Bank* (JAMS Arbitration);

*Megan Veraldi v. Credit One Bank* (JAMS Arbitration); *Samantha Walters v. Credit One Bank* (JAMS Arbitration); *Brenda Walton v. Credit One Bank* (JAMS Arbitration); *Thomas Watson v. Credit One Bank* (JAMS Arbitration); *Anita Welch v. Credit One Bank* (JAMS Arbitration); *Trisha West v. Credit One Bank* (JAMS Arbitration); *Jill Williams v. Credit One Bank* (JAMS Arbitration); *Marie Wills v. Credit One Bank* (JAMS Arbitration); *Joy Wilson v. Credit One Bank* (JAMS Arbitration); *Christy Wineinger v. Credit One Bank* (JAMS Arbitration); *Sean Woodburn v. Credit One Bank* (JAMS Arbitration); *Michelle Robertson v. Navient Solutions, Inc.*, Case No.: 8:17-cv-01077-RAL-MAP (M.D. Florida Tampa); *Cynthia Davis v. Conn Appliances,* Case No.: 01-0000-9774 (American Arbitration Association); *Tonya Erin Stevens v. Conn Appliances, Inc.*, Case No. 01-16-0003-2324, (American Arbitration Association); *Aaron Manopla and Evelyn Manopla v. Home Depot USA, Inc*, Case No.: 3:15-cv-01120-PGS-TJB (District of New Jersey); *Laticia Lewis v. Ocwen Loan Servicing, LLC*, Case No.: 17-cv-01104-WJM-KHR (D. Colo); *Mirella Covarrubias v. Ocwen Loan Servicing, LLC*, Case No.: 5:17-cv-00904-FMO-SP (C.D. Cal); *Gregory Franklin v. Ocwen Loan Servicing, LLC*, Case No.: 3:17-CV-02702-JST (N.D. Cal); *Richard Quinones v. Ocwen Loan Servicing, LLC*, Case No.: 2:17-cv-03526-DDP-FFM (C.D. Cal); *Susan Embree v. Ocwen Loan Servicing, LLC*, Case No.: 2:17-CV-00156-JLQ (E.D. Wash); *John Herrick v. Godaddy.com, LLC*, Case No.: 2:16-cv-00254-DJH (D. Az); *Teresa Caserez v. Credit One Bank, N.A.*, Case No.: 140003908 (JAMS Final hearing); *Johnnie Williams, Jr. v. Conn Appliances, Inc.*, Case No.: 01-17-0001-5149 (American Arbitration Association - Final Hearing); Steve Bartolone and *Karen Bartolone v. Ocwen Loan Servicing, LLC*, Case No.: 8:17-cv-00821-JLS-JDE (C.D. Cal); *James Hunter v. Navient Solutions, LLC*, Case No.: 1460004086 (JAMS Arbitration); *Edith Wright v. Conn Appliances, Inc.*, Case No.: 01-17-0006-8865 (American Arbitration Association); *Brian Dennis v. Conn Appliances, Inc.*, Case No.: 01-17-0006-3428 (American Arbitration Association); *Wavely Jacobs v. Conn Appliances, Inc.*, Case No.: 01-17-0006-1673 (American Arbitration Association); *Lilly,*

Case 4:18-cv-00628-FJG   Document 61   Filed 06/07/19   Page 14 of 39

*Catherine v. Citigroup Inc. d/b/a Citi*, Case No.: 01-0001-9107 (American Arbitration Association); *Raul Vargas v Conn Appliances*, Case No.: 01-17-0000-4085 (American Arbitration Association); *Lina Trivedi v Web Bank and Bluestem Brands, Inc. d/b/a Fingerhut*, Case No.: 01-18-0000-2860 (American Arbitration Association - Final Hearing); *Sara Diaz-Lebel v TD Bank USA, N.A.; and Target Corporation*, Case No.: 0:17-cv-05110-MJD-BRT (D.Minn); *Karl Critchlow v Sterling Jewelers Inc. d/b/a Jared Galleria of Jewelers*, Inc., Case No.: 8:18-cv-00096-JSM-JSS (M.D. Flor Tampa Division); *Latonja Anderson v Credit One Bank*, Case No. 1440005234 (JAMS Arbitration – final hearing); *Sandra Harris v Credit One Bank, N.A.*, Case No.: 144005582 (JAMS Arbitration - Final Hearing); *Deborah Clark v FDS Bank and Department Stores National Bank*, Case No.: 6:17-cv-00692-CEM-TBS (M.D. Flor - Evidentiary Hearing); *Shanica Spencer v Conn Appliances, Inc.*, Case No.: 01-17-0007-5670 (American Arbitration Association).

### **_Work and Analysis in this Case_**

13.     I have reviewed various documents and evidence from this case relating to the SMS messages sent to Plaintiff, and I have reviewed various other documents relating to the use and regulation of autodialers. Specifically, I have reviewed the following documents: 1) Exhibit B - Doc M - Business Texting Features, landscape (Cranor_000001-20); 2) Exhibit C - Doc N - Business Texting Features (Cranor_000021-35); 3) Exhibit D - Doc P - Chrome Extension (Cranor_000036-48); 4) Exhibit E - FAQ_can I send messages to groups of customers; 5) Exhibit F - FAQ_can I have TextUs open on multiple computers; 6) Exhibit G - Group Broadcast Messages; 7) Exhibit H - Best Practices for Sending Broadcast Messages _ TextUs Help Center; 8) Exhibit I - How do I know that my Broadcast was successfully scheduled_ _ TextUs Help Center; 9) Exhibit J - How to Create a Group and Add Contacts _ TextUs Help Center; 10) Exhibit K - How to Delete a Group _ TextUs Help Center; 11) Exhibit L -

How to Import_Add Contacts into Group via Spreadsheet _ TextUs Help Center; 12) Exhibit M - How to Personalize Broadcast Messages _ TextUs Help Center; 13) Exhibit N - How to Schedule and Send a Group Broadcast _ TextUs Help Center; 14) Exhibit O - How to Search for a Specific Group _ TextUs Help Center; 15) Exhibit P - Organization Admin Analytics _ TextUs Help Center; 15) Exhibit Q - What is a Broadcast Message_ _ TextUs Help Center; 17) Exhibit R - Why are my messages red and saying _Not Delivered__ _ TextUs Help Center; 18) Exhibit S - changes-to-group-broadcasting-video[1]; 19) Exhibit T - TextUs_ Tutorial - Groups & Broadcasts[2]; 20) Exhibit U - textus-organization-admin-features-training-video[3].

14.     Additionally, I have reviewed the following documents: 1) 1992 comments to FCC; 2) 1992 FCC Order; 3) About IMS; 4) ATDS and predictive dialers 1970-1992; 5) Charles Messer Amicus Brief; 6) Davox Marketing; 7) Dialer_Manager_Help; 8) DOC-351062A1; 9) FCC 2003 Order; 10) FCC 2012 Order; 11) FCC response to ACA; 12) IMS Customer List; 13) IMS Do Not Contact Solutions; 14) Mark Hays 01-25-2019_cond; 15) Noble TCPA Compliance Solution; 16) program.17146.MP4-D20; 17) TextUs 3-8; 18) US Patent 3229042; 19) NPAC; 20) Order on appeal vacating and remanding (9 20 18); 21) The Big 2 Myths You Probably Believe About Manual Dialing - Part 1; 22) The Big 2 Myths You Probably Believe About Manual Dialing - Part 2; 23) US Patent 3317678; 24) US patent 3943289; 25) US patent 4933964; 26) Wash Times 1991; 27) wireless block identifier; 28) 26. STIPULATED PROTECTIVE ORDER; 29) D203 Follow-Up Contacts List (Confidential)-c; 30) D000323  Unknown list 03.08.19-

---

[1] Exhibit S was obtained from https://player.vimeo.com/video/190008263 via https://help.textus.com/video-library/textus-web-app/changes-to-group-broadcasting-video on May 18, 2019 via the TextUS website.

[2] Exhibit T was obtained from https://player.vimeo.com/video/77921773 via https://help.textus.com/video-library/textus-web-app/groups-broadcasts-video on May 18, 2019 via the TextUs website.

[3] Exhibit U was obtained from https://player.vimeo.com/video/285195190 via https://help.textus.com/organization-admin-tools/tools/textus-organization-admin-features-training-video on May 18, 2019 via the TextUs website.

c; 31) D000324 broadcasts-Zack Group-c-c; 32) TEXTUS0000371; 33) TEXTUS0000372; 34) Cranor_000095-Cranor_000098; 35) Cranor_000115-Cranor_000117; 36) D62-63 L. Canor Convo; 37) D49-59 TextUs - Zack Group contract (Confidential); 38) NurseRecruiter Declaration_signed; 39) Zack 1st Supp'l Ans. to Interrogs.  2, 4, 6, 13; 40) Zack 1st Supp'l Resp. to Doc. Reqs. 4, 5; 41) Zack 2d Supp'l Answers to P's Interrogs. 1, 2, 4, 6, 10-14; 42) Zack 2d Supp'l Responses to P's Doc Reqs (1st Set); 43) Zack Answers to P's Interrogs (1st Set); 44) Zack Reponses to P's Doc Reqs (1st Set); 45) Zack Responses to P's Doc Reqs (2d Set)

15.     Additionally, I received an export of the SMS messages, contacts, phones, and groups (Broadcast campaigns), and field explanations. (*TEXTUS0000373.xlsx*)

16.     Additionally, I was provided several sets of data which will be addressed in the data analysis section below.

17.     Based upon the documents and evidence I have reviewed, and my experience and knowledge of the TextUS Blasting application used by The Zack Group, I conclude that The Zack Group used an SMS Blasting application, a type of automatic telephone dialing system, to send SMS messages to the Plaintiff.

### *The Zack Group used an SMS Blasting application, which has the Characteristics of an Automatic Telephone Dialing System*

18.     I have been retained in part to evaluate whether the telephone dialing systems used by The Zack Group to send SMS messages at issue in this case was an SMS Blasting application or otherwise has the characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act, 47 U.S.C. § 227. ("TCPA"). According to the FCC:

> "The TCPA defines an 'automatic telephone dialing system' as 'equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.' The statutory definition contemplates autodialing equipment that

14

either stores or produces numbers. It also provides that, in order to be considered an 'automatic telephone dialing system,' the equipment need only have 'the *capacity* to store or produce telephone numbers (emphasis added)'...."

*(See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Red. 14014, at ¶ 131-134 (2003) (the "FCC 2003 Order")).*

19.     Within the industry, "Automatic Telephone Dialing System", or "auto-dialer" for short, has been attributed to any system with the capacity to automatically dial phone numbers.  Naturally, for a system to automatically dial phone numbers, the system must either produce or store those phone numbers.  Within the industry, these terms were not applied to systems that would only call one pre-programed number such as a home security system or speed dial, but were applied to systems used for telemarketing or call centers.  These names have been attributed to these systems for over 50 years.  There are different types of "auto-dialers" such as "predictive dialers," "power dialers," and dialers that deliver pre-recorded messages (commonly referred to as "voice broadcasting").  Within the industry, these systems are not defined by any other terms when used in other dialing modes such as manual or preview.  The fact that these terms have been used to define auto-dialers for over 50 years can be corroborated or discovered by a few clicks through the Patent Office's website (new patents cite old patents) which yields these historical insights.  The FCC's understanding seems to be consistent with the industry's understanding.  (*See FCC 2003 Order, at ¶¶ 131-134 (finding that a predictive dialer falls within the TCPA's definition of "automatic telephone dialing system"); FCC 2012 Order footnote 12, ¶ 20; FCC response to ACA page 57 of 110; FCC 1992 Order ¶¶8-9).*

20.     Within the industry, autodialers only need to store or produce numbers and call them to be an ATDS.  In this case, the SMS Blasting application used by The Zack Group is capable of doing both.  Because the terms used within the industry are the same as the terms used by the FCC and the TCPA, to clarify my use of the terms in my report, I will point out that when referring to the FCC's or TCPA's definition I will

---

15

clarify, as I did in the previous paragraph, by stating, "characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act." Otherwise, when I use these terms, I am using them in the context which they have been used for decades within the industry.

21.     The term "Predictive dialer" was not created by the FCC in their 2003 Order or their 1992 Order. Nor was the term "automatic telephone dialing system" created by Congress. These are terms that have been used to describe such equipment, by those in the industry for decades. Norman A. Sheldon filed a patent (*US patent 3,943,289*) on July 12, 1974 for what he called a "automatic telephone dialing system" (*US patent 3,943,289 page 4 column 2 line 63*) which dialed numbers from a sequential number generator and delivered pre-recorded messages to telephone subscribers. He chose to use a sequential number generator because at that time computer storage was very expensive (*US patent 3,943,289 page 4 column 2 lines 2-11*). Although he chose to use a sequential number generator, stored lists of numbers had been used for many years prior to his patent. (*See US Patent 3229042; US Patent 3317678*). In July 25, 1989, Bassem M. Girgis filed a patent (*US patent 4,933,964*) for a "predictive outbound dialing system" (*US patent 4,933,964 page 19 column 2 line 53*) which used an "input call list" (*US patent 4,933,964 figure 3*) stored in the system to call those numbers in advance predicting when a live agent would be available using a predictive algorithm. This system was designed to call out on more lines than available agents from a list of numbers, listen for rings, busy, and answered calls, and connect the calls to agents by predicting when they would be available.

22.     For the last half century, two types of autodialers have existed 1) Agent-less dialers which used either stored lists of numbers or numbers produced with a random or sequential number generator. These made agent-less calls such as pre-recorded messages or artificial voice; And now they send SMS messages. (*See Mr. Hamm's testimony in program.17146.MP4-D20*). *2*) Dialers that make agent-calls utilizing live agents and stored lists of numbers purchased from list brokers (*See Robert*

*Bulmash's testimony in program.17146.MP4-D20*).  The dialing system used by The Zack Group is the first type, an agent-less dialer.  The functionality of the autodialers and predictive dialers has not changed since long before the TCPA until now with the exception that modern dialers can make more calls in a shorter period of time.  Attached as I have referenced examples of articles and job postings illustrating that the exact same type of equipment was used over the last four decades, along with the terms "Automatic Telephone Dialing System" and "Predictive Dialer," long before Congress or the FCC considered the equipment.  (*See ATDS and predictive dialers 1970-1992; FCC response to ACA, at pp. 13-14 footnote 3*).  The equipment described in the TCPA, the FCC 2003 Order and the 1992 FCC Order have precisely the same characteristics as the equipment that is in use today and used by The Zack Group.

23.    The fact that the dialer places calls to numbers stored by the dialing system and delivers autodialed calls, in the form as a message blast without agents, indicates that the dialer has the characteristics of an ATDS, as it relates to the 1992 FCC Order ¶¶8-9 (*See 1992 FCC Order ¶¶8-9*).

24.    Additionally, the properties of the dialing system have the precise capabilities of the Textmunications system, which I analyzed, used by Crunch San Diego in Marks v Crunch (*See Order on appeal vacating and remanding (9 20 18))*.

25.    Based upon the documents and evidence I have reviewed and my knowledge of the TextUs Blasting application, the SMS messages that The Zack Group sent to Plaintiff were made using an SMS Blasting application.  As explained further below, in my expert opinion, the below dialing system that is discussed in detail has the characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the TCPA.

26.    I would note that I am not relying on the FCC 2003 Order, the 2008 FCC Order or the 2012 FCC Order to form my opinion.  I make reference to those Orders to show that the FCC provided a very detailed technical description of predictive dialers

which primarily call from lists. The 1992 FCC Order highlighted that predictive dialers were the only ATDS that involved live agents (*See 1992 FCC Order ¶¶8-9*). Predictive dialers have remained unchanged in their functionality since their invention in the mid-1970's. As I illustrated, predictive dialers were so common place that the terms for automatic telephone dialing systems and predictive dialers became common parlance. I would note that since 1991, autodialers became limited to only those within the call center industry; perhaps this is why the terms are not common parlance today. Simply stated, when I set up predictive and autodialers before the 2003 Order, there was no question in my mind, as a telemarketer, that my equipment was an ATDS. My understanding was the same as the commenters to the FCC in 1992 (*See 1992 comments to FCC*); my understanding was the same as Robert Bulmash's understanding of predictive dialers (*See program.17146.MP4-D20.mp4*). That understanding remains consistent today with those that are in the call center industry.[4]

27.    In this matter the SMS blasting application is very simple and straightforward. It is designed similar to an email blasting application. There is a contact section that would allow one to import and export contacts. There is a "group" section where the message would be created, a list of contacts would be selected and the SMS message would be scheduled to be delivered to the contact list. The system is administered from any computer with a web browser, such as any Microsoft Windows computer. SMS blasting applications, such as this one, typically do not have a manual, because they are so simple to use. This application is designed to be familiar to the user, mimicking an email blasting application, with controls and menu items already familiar to the user. The operation is also simple; generate a list of phone numbers or select a predefined list on the client computer and import to the "contacts" section. Then, select the list, add it to a group, then specify message and delivery options. (*See*

---

[4] The "call center industry" as opposed to "debt collection" or "telemarketing." Dialer Administrators are not confined to either Debt Collection or Telemarketing industries; the autodialer and predictive dialer is the same no matter what the content of the call is.

*Mark Hays 01-25-2019_cond pp. 9:20-25, 10:1-6, 24:17-25, 25:1-15, 29:23-25, 30:1-25, 31:1-25, 32:1-25, 33:1-25, 37:21-25, 38:1-25, 39:1-10, 40:2-25, 41:1-25, 42:1-14, 55:6-25, 56:1-25, 57:1-25, 58:1-25, 59:1-17, 62:24-25, 63:1-25, 64:1-10; Exhibit C - Doc N - Business Texting Features (Cranor_000021-35); Exhibit D - Doc P - Chrome Extension (Cranor_000036-48); Exhibit E - FAQ_can I send messages to groups of customers; Exhibit F - FAQ_can I have TextUs open on multiple computers; Exhibit G - Group Broadcast Messages; TextUs 3-8; Exhibit H - Best Practices for Sending Broadcast Messages _ TextUs Help Center; Exhibit I - How do I know that my Broadcast was successfully scheduled_ _ TextUs Help Center; Exhibit J - How to Create a Group and Add Contacts _ TextUs Help Center; Exhibit K - How to Delete a Group _ TextUs Help Center; Exhibit L - How to Import_Add Contacts into Group via Spreadsheet _ TextUs Help Center, Exhibit M - How to Personalize Broadcast Messages _ TextUs Help Center, Exhibit N - How to Schedule and Send a Group Broadcast _ TextUs Help Center; Exhibit O - How to Search for a Specific Group _ TextUs Help Center; Exhibit P - Organization Admin Analytics _ TextUs Help Center; Exhibit Q - What is a Broadcast Message_ _ TextUs Help Center; Exhibit R - Why are my messages red and saying _Not Delivered__ _ TextUs Help Center; Exhibit S - changes-to-group-broadcasting-video; Exhibit T - TextUs_ Tutorial - Groups & Broadcasts; Exhibit U - textus-organization-admin-features-training-video)*

28.     TextUs did see the potential for abuse and attempted to limit the SMS Blasting application to 100 messages per group.  This limitation is no limitation at all. The system is designed to send blasts of SMS messages to any number of groups.  To overcome this one only need to create more groups and schedule the delivery of SMS messages for those groups. (*See Mark Hays 01-25-2019_cond pp. 25:1-15, 30:1-25, 31:1-7, 37:21-25, 38:1-25, 39:1-10, 40:2-25, 41:1-25, 42:1-14, 55:6-25, 56:1-25, 57:1-25, 58:1-25, 59:1-17*)  Whether scheduling messages to one group or hundreds of groups, the system is still capable of broadcasting thousands of messages within

---

19

seconds. There were 229 such groups in the data provided. (*See TEXTUS0000373 Broadcasts tab*)

29.    After reviewing the above documents, and based on my experience with predictive dialers and autodialers, I am of the opinion that The Zack Group used the above SMS Blasting application to send SMS messages to Plaintiff, and that the dialer has the capacity to store or produce numbers to be called, using a random or sequential number generator, and the capacity to call such numbers. Specifically, the dialer is capable of automatically and without human intervention calling numbers that are stored as a list, which itself is stored in a table of a database.

30.    Thus, in my expert opinion, the dialing system (as outlined above) has the characteristics of an ATDS as contemplated by the TCPA, because these systems have the capacity to store numbers in a list and dial them without human intervention and also has the capacity to generate numbers to form a list for dialing without human intervention.

31.    The FCC also has grouped dialers into two categories: those that have live agents (predictive dialers) and those that are agent-less (pre-record, artificial voice). Within the industry, SMS Blasting applications are the exact same functionality as any other agent-less dialer. (*See 1992 FCC Order ¶¶ 8, 9*)  Even in the Senate hearing on July 24, 1991, two separate types of systems were discussed, agent-less dialers that sometimes called from generated numbers and predictive dialers (live agent dialers) that called numbers stored as a list. (*See program.17146.MP4-D20.mp4).*  Systems, such as the one listed above, used by The Zack Group, that are capable of calling lists of numbers to deliver a pre-recorded message or systems that call numbers to deliver a text or SMS message have no live agents involved (Referred to as "Agent-less" calls by those in the industry); therefore, there is little confusion on their capacity to store or produce numbers and to call them.

32.    I would point out that making a computer generate a list of 10 digit numbers "out of thin air", is a relatively trivial task. All computers can generate

random or sequential numbers.  A computer system simply cannot operate without the ability to do so.  A "pseudo random number generator" is a key element in allowing a computer to "compute."  Computers are designed to do math and counting i.e. "to compute."  For example, typing "seq 6192486000 6192486999 > sequential_numbers_to_call.csv" creates a list of 10,000 Sprint Wireless Numbers to be called (this was done on my regular laptop with no additional software installed).  In other words, my laptop running Linux has natively installed a "sequential number generator" that can produce a list of phone numbers.  Windows computers have a similar command line function as well.  Typing "for /L %i in (2480000,1,2489999) do @echo 619%i >> sequential_numbers_to_call.csv" generates the same list on a Windows computer.

33.    Most vendors of autodialers do not re-invent the wheel by creating a utility to generate numbers that would inherently be present with the Operating System.

### ***From the Microsoft Windows Command Prompt:***

From the bottom left of the screen in the search field type "CMD" and "Command Prompt" will appear in the suggested match list.  Right click the "Command Prompt" link and select "Run as Administrator."  The Command prompt window will appear.

21



Type "for /L %i in (2480000,1,2489999) do @echo 619%i >> sequential_numbers_to_call.csv" and press enter.

After about 10 seconds the prompt will return to "C:\" indicating the list of 10,000 sequential Sprint Wireless numbers is completed. At this time, the list is in the proper format to add to a calling campaign on the TextUS SMS application. To view the list, simply open in Microsoft Excel or type "type sequential_numbers_to_call.csv" in the Command Prompt window and press "Enter."



From the Linux Bash Shell

Open a root shell



Next, type "seq 6192486000 6192486999 >

sequential_numbers_to_call.csv" and press "Enter."  The same list of 10,000

Sequential numbers has been generated.  The list is in the proper format and can

be added to a calling campaign just as any other list.  To view the list, simply

open it in Microsoft Excel or type "cat sequential_numbers_to_call.csv" and

press "Enter."

CRANOR v. THE ZACK GROUP
WRITTEN REPORT OF JEFFREY A. HANSEN

Case 4:18-cv-00628-FJG    Document 61    Filed 06/07/19    Page 27 of 39

34.     The TextUS SMS application is a hosted dialer that requires a client computer, either Micosoft Windows or Linux.  Of course, storage of numbers does not discriminate on how the numbers were produced as computer storage can store any kind of data regardless of how it was produced whether loaded from a list of known numbers or a list of sequentially generated numbers. (*See FCC Response to ACA. at. 6, 12, 13, 24, 36, 37, 38, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 52*).

35.     I would note that the industry has classified any system capable of auto-dialing phone numbers as an auto-dialer whether the numbers are stored **or** produced.  Also, for systems to produce numbers, those numbers still need to be stored before dialing them. (*See ATDS and predictive dialers 1970-1992; Davox Marketing; 1992 comments to FCC*)

36.     Within the industry, human activity (or lack of) does not define the equipment as an autodialer just as using a wrench as a hammer does not actually change the wrench to a hammer; it still remains a wrench.  Human activity in running the dialer does not change the fact that the dialer will "blast" messages to hundreds or thousands of phone numbers with the click of a mouse.  Interactive Intelligence, a popular predictive dialer vendor, is not shy about highlighting the primary functionality of a predictive dialer is that of a predictive dialer, "Interaction Dialer's primary purpose is efficient placement of outbound calls.  Interaction Dialer is both an automated dialer and predictive dialer.  It supports supplemental dialing modes for added flexibility." (*See Dialer_Manager_Help pp. 416-420*) The dialer at issue in this matter, however, was used in an automatic dialing mode, referred to a "blast" or "broadcast" within the industry.  (*See Mark Hays 01-25-2019_cond pp. 24:17-25; 25:1-15; 29:23-25; 30:1-25; 31:1-25; 32:1-25; 33:1-25; 62:24-25; 63:1-25; 64:1-10*)  As illustrated in my steps taken (shown in the following section), my methods are consistent with those of the industry.  (*See The Big 2 Myths You Probably Believe About Manual Dialing - Part 1; The Big 2 Myths You Probably Believe About Manual Dialing - Part 2; Noble TCPA*

Case 4:18-cv-00628-FJG   Document 61   Filed 06/07/19   Page 28 of 39

*Compliance Solution; ATDS and predictive dialers 1970-1992; Davox Marketing*)  My understanding is also consistent with the understanding preceding the TCPA as illustrated by the history I provided of autodialers and predictive dialers.  My understanding in consistent with the telemarketers and debt collectors who submitted comments to the FCC regarding the TCPA in 1992 and also the 1992 FCC Order (*See 1992 comments to FCC; 1992 FCC Order ¶¶8-9*).  My understanding is Consistent with one TCPA defense counsel's expert (*See Charles Messer Amicus Brief pp. 12-16*).  My understanding is consistent with Mr. Hamm and Mr. Bulmash (*See program.17146.MP4-D20.mp4*)  Additionally, while I was setting up autodialers and predictive dialers before 2003, I had no doubt that my agent-less auto dialers where autodialers.

37.     Based upon my review of the documents and evidence provided in this case, based on my knowledge of computer storage and computer processing, and based on my knowledge of autodialers and predictive dialers, it is also my expert opinion that the SMS messages sent by The Zack Group to Plaintiff using the dialer described in detail above were made using an SMS Blasting application that has the characteristics of an automatic telephone dialing systems as defined by the TCPA.

### *Additional steps taken in Analyzing The Zack Group's Dialing System*

38.     To analyze the system, the first step was to identify the components of the system.  All the individual components of the system by themselves are incapable of performing any specific task.  For example, autodialing software needs to be installed on an Operating System such as Microsoft Windows or Linux.  The Operating System is required to be installed before any other programs such as the autodialing software.  The Operating System also is what would allow programs, such as the dialing software, to interact with the hardware of the system (standard computer hardware).  To illustrate, no single component of an automobile is capable of transporting someone from point A to point B, but instead many components are combined to create a single system.  The

automobile needs a chassis, akin to the Operating System of a dialer. The automobile also needs an engine, akin to the dialing software. Typically, software is not created to perform a task that is handled by the Operating System in which the software is installed on, such as the generation of phone numbers discussed earlier in my report. To do so would be redundant, as would be having two radios in the automobile. In the case of TextUS, the dialer is hosted on the internet, and the system is administered on a client computer, either Microsoft Windows or Linux. Earlier in my report, I provided the exact command to generate a list of numbers from either the server hosting the dialer software or the client the operator of the dialer sits at. Lists are loaded from the client to the dialer, settings to campaigns are made from the client computer. This "Client-Server" relationship is the same as the mainframe-terminal relationship seen in computer systems in the past. This "Client-Server" relationship is often referred to as a "Distributed Application Structure" because it partitions tasks or workloads over a resource or service much the same way that each component of an automobile is responsible for a particular function in the overall system. This distributed application model has also been referred to as "Software as a Service" ("SaaS") with web based applications combined with the client computer connecting to the web server. The FCC highlights that the system is comprised of components in their 2003 order "a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." (*See FCC 2003 Order, at ¶ 131*)

**39.** I would note that predictive dialers were intended to primarily call from a defined list of numbers since the time they became popular in the mid 1970's and at that time agent-less dialers also were generally designed to call from lists of numbers. As I illustrated earlier, "predictive dialers," and "autodialers" were common parlance within the telemarketing and debt collection industries, but also well understood outside those

industries two decades later when the TCPA was enacted. (*See FCC response to ACA pp. 13-14 footnote 3; Wash Times 1991; 1992 FCC Order ¶¶ 8-9; 1992 comments to FCC; Davox Marketing; Charles Messer Amicus Brief pp. 12-16*).  As stated earlier in my report, autodialer's functionality has not changed since Davox marketed their predictive dialers throughout the 1980's.

### *Identification of Wireless Numbers, and Identification of SMS messages to potential class members for SMS group messages contained in TEXTUS0000373*

40.     In this case, I was asked to simply compare or "scrub" the call records exported from the TextUs platform, used by The Zack Group, against two telephone number databases widely used by industry to identify the telephone numbers that are assigned to cell phones, and identify whether the telephone numbers assigned to cell numbers have been previously or subsequently reassigned or "ported" to or from landlines.  I was provided an export of all the SMS messages sent and the associated group broadcasts from the TextUs SMS blasting application for the entire class period. (*TEXTUS0000373.xlsx*)

41.     I was provided an Excel Spreadsheet with multiple tabs ("TEXTUS0000373").  Using the named plaintiff I was able to identify the various tabs, their content, and the key fields to "join" the data sets into a single CSV file.  The first step was to convert each of the tabs in TEXTUS0000373 into individual csv files and import each into a relational database. (*Also see TEXTUS0000371, TEXTUS0000372*)

42.     The "Broadcast Messages" contained one row for every group text sent and reflects, among other things, various date/time fields and the substance of the text. The "Broadcast Messages" tab does not contain the phone number the text was sent to, but it contains a field called "contact_id" that corresponds to the "id" field of the "Contacts" Tab. "Contacts" also contains a "phone_id" field that corresponds to the "id" field of the "phones" tab, which contains the actual phone number in the "number" field. Additionally, I was able to verify that my final results would only include those

messages sent by a group message by using the "Broadcast" tab data. The "id" field in the "Broadcast" data corresponds with the "broadcast_id" field in the "Broadcast message" data. Using these key fields, I was able to join this data together using multiple "inner joins."

43.    To summarize, this process created a single master list, for each row in the Broadcast Messages tab adding the relevant fields from the Contacts tab (id, first_name, last_name, phone_id) as well as the relevant fields from the Phones tab (id, number, country, line_type). All of this process was done with "inner joins" to ensure that only the messages that were sent as a group message (Broadcast Messages) were captured; but for redundancy this was also verified using the Broadcasts data verifying the particular "group" or "broadcast" campaign the messages were sent from.

44.    I understand TextUs automatically scrubs for cellphone numbers. I also performed a scrub for cell numbers to ensure only wireless numbers at the time of receiving a SMS message were included.

45.    I am familiar with the databases used to determine whether a particular telephone number is assigned to a cell phone, and determine whether the number was ever reassigned from a landline to a cell phone or vice versa, because I personally use them on a regular basis. I have personally compared lists of telephone numbers against these same databases to identify which numbers are cell phones, and whether and when numbers had been reassigned from landline to cell phone or vice versa, on countless occasions over the years.

46.    The database I regularly use and rely on in my business to determine if a telephone number has been assigned to a cell phone is the Interactive Marketing Solutions or "IMS" wireless cell block identifier list. This list was compiled by Interactive Marketing Solutions and the Direct Marketing Association. (*See IMS Do Not Contact Solutions; About IMS; IMS Customer List; wireless block identifier*).

47.    I believe the FCC's Enforcement Bureau, Telecommunications Consumers Division ("TCD") has relied on the IMS database, which the FCC has described as "an

industry standard, commercially available database of known assigned and ported wireless numbers…" FCC 14-59, 29 FCC Rcd 5537, ¶7, fn.16 (rel. May 8, 2014) ("TCD compared the call records to an industry-standard, commercially available database of known assigned and ported wireless numbers to determine whether the Company made robocalls to wireless telephones. See Interactive Marketing Solutions, Inc. Website, http://www.ims-dm.com/index.shtml"); see also DA 13-265, 28 FCC Rcd 1840, ¶9 and fn.25 (rel. March 15, 2013), citing Interactive Marketing Solutions, Inc. Website http://www.ims-dm.com/index.shtml); and DA 15-530, 30 FCC Rcd 4548, ¶7 and fn.24 (rel. May 4, 2015), citing Interactive Marketing Solutions, Inc. Website Homepage www.ims-dm.com/mvc/index.php.

48.     The database I regularly use and rely on in my business to determine whether a cell phone number has been reassigned or "ported" to or from a landline is the Neustar (Now, iconnectiv[5]) ported-to-wireless list and ported-to-landline list. Neustar/iconnectiv is the ultimate resource of these lists because it was selected by the FCC to be the administrator of the Number Portability Administration Center (NPAC), the telecommunication industry's common, authoritative database for routing calls for numbers ported between landline and wireless. (*See NPAC, DOC-351062A1*). The FCC also appointed Neustar/iconnectiv as the North American Numbering Plan Administrator, which is responsible for the U.S. telephone numbering system. (FCC 03-153, 18 FCC Rcd 14014, ¶170 (rel. July 3, 2003) ("NeuStar as the North American Numbering Plan Administrator, the National Pooling Administrator, and the LNP Administrator makes information available that can assist telemarketers in identifying numbers assigned to wireless carriers.")).

49.     My process was to identify wireless telephone numbers identified if they were wireless at the time they were called. My process does account for a 15 day grace

---
[5] See Exhibit U - DOC-351062A1

period[6] for numbers ported from landline to wireless. If asked, I could easily remove the 15 day grace period.

50. To do this, I first compared all of the telephone numbers listed in the logs against the numbers listed in the IMS database. This involved simply copying the Defendant's call records and the IMS wireless cell block identifier list into a conventional database program and then executing a basic command telling the program to compare the two lists to identify the matches.

51. Then I compared the list of phone numbers in Defendant's call records to the list of phone numbers in the Neustar/iconnectiv database to see which ones had been reassigned from landline to cell or from cell to landline. This involved the same process described above. I copied the Neustar/iconnectiv ported number lists into the relational database with Defendant's call records and executed a basic command telling the program to compare the lists to identify the matches, and simultaneously identify which of the numbers that were reassigned were nevertheless wireless numbers at the time of the call. The lists include a date field showing when each number was reassigned or ported, if any.

52. Finally, for ease of understanding, I executed a command to identify the number of unique phone numbers listed in the Call Detail Records, the total number of phone numbers that were assigned to cell phones, and the number of cell phones that were reassigned to or from a landline at some point in time.

53. Furthermore, the process by which Qualifying Calls and the dates those calls were made are compared to the IMS Files includes a specific comparison to ensure that the status of each Qualifying Call is or is not wireless at the time of the call.

54. Wireless phone numbers are initially assigned to wireless carriers in large blocks of numbers. Using the wireless block identifier, it is very easy to identify those numbers originally assigned as wireless numbers. When a user of those numbers decide to port that wireless number to landline (or vice versa), a request is made through

---

[6] In my process, I counted a number as wireless if it was called later than 15 days after the number was ported to wireless.

Neustar/iconnectiv who then re-assigns that number to landline. Neustar/iconnectiv then makes that list of ported numbers available every night. Each nightly update includes ported numbers from the beginning of number portability, so all that is required to identify ported numbers with 100 percent accuracy is by using a ported number list that is more recent than the last call made. Using the date of the calls and comparing that with the date of the ported numbers, I was able to identify with 100 percent accuracy those calls that were made to a number ported to wireless after those numbers were ported (additionally, I identified those calls with a 15 day grace period of the porting of that number).

### *Results of my analysis of wireless numbers which received an SMS message.*

The results of my analysis of the outbound Call Detail Records where SMS message was delivered:

Total number of Group broadcasts: 229

Total numbers assigned to a wireless service when they received a SMS message: 11,329 (*Exhibit V - Unique Cells Called*)

Total SMS messages to those numbers: 14,092 (*Exhibit W - Calls to Cells*)

55. Additionally, I was asked to further reduce the totals after removing group SMS messages sent to employees identified in D000327 Employee List -c -c.xlsx. I identified any SMS messages sent to employee phone number that were sent on or after the employment start date and excluded those SMS messages from my totals. For the few employees that had multiple entries, I selected the earliest hire date. This reduced the totals to:

Total numbers assigned to a wireless service when they were sent a SMS message: 11,278 (*Exhibit X - unique Calls to Cells not employee*)

Total SMS messages to those numbers: 14,019 (*Exhibit Y - Calls to Cells not employee*)

---

32

56.     Additionally, I was asked to further reduce the totals after removing job applicant phone numbers from Career Builder.  I was provided a list of Job Applicants, "Exhibit AF - Index of Career Builder Emails.csv," containing information from email notifications Career Builder sent to Defendants.  I identified any SMS messages sent to an employee phone number that were sent on or after the application date and excluded those SMS messages and phone numbers from my totals.  For the few applicants that had multiple entries, I selected the earliest application date.  This reduced the totals to:

Total numbers assigned to a wireless service when they were sent a SMS message: 11,262 (*Exhibit Z - unique Calls to Cells not employee nor career builder*)

Total SMS messages to those numbers: 13,996 (*Exhibit AA - Calls to Cells not employee nor career builder*)

57.     Additionally, I was asked to further reduce the totals after removing job applicant phone numbers from Indeed.  I was provided a list of Job Applicants, "Index of Exhibit AG - indeed email list.csv," containing information from email notifications Indeed sent to Defendants.  No phone numbers from the Indeed email list were contained in the list of SMS messages where the employees and Career Builder applicants were removed.

58.     Additionally, I was asked to further reduce the totals after removing job applicant phone numbers from NurseRecruiter.com.  I was provided a list of Job Applicants, "Zack Group candidates HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY.csv." I was asked to provide two separate totals.  One for all the wireless numbers in "Zack Group candidates HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY.csv," and the other one with only those identified with the source type = job.  This reduced the totals to the following two sets of totals

### *For the whole data set*

Total numbers assigned to a wireless service when they were sent a SMS message: 9,720 (*Exhibit AB - HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY unique Calls to Cells not employee nor career builder nor nurse recruiter*)

Total SMS messages to those numbers: 10,816 (*Exhibit AC - HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY Calls to Cells not employee nor career builder nor nurse recruiter*)

### ***For those with the source "job"***

Total numbers assigned to a wireless service when they were sent a SMS message: 11,260 (*Exhibit AD - HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY unique Calls to Cells not employee nor career builder nor nurse recruiter job source*)

Total SMS messages to those numbers: 13,994 (*Exhibit AE - HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY Calls to Cells not employee nor career builder nor nurse recruiter job source*)

59.     After performing each step of the analysis in paragraphs 54-58 above, I checked the results for Plaintiff's cellular telephone number and whether there were SMS messages to that number. Plaintiff's cellphone number is included in each data set of unique numbers, and each data set of SMS messages sent includes two SMS messages to Plaintiff's number: one on 4/27/2018; and one on 6/13/2018.

60.     Additionally, I was provided an additional list of followup contacts. This list contained partially redacted phone numbers. If it were determined by the court or by the parties that those numbers should be excluded from the class and an unredacted list were provided, it would take approximately five minutes to perform that task.

61.     I reserve the right to amend, modify or supplement the statements and opinions set forth herein as appropriate.

62.     I declare that the foregoing is true and correct, subject to the laws of perjury of the United States. Executed in Spring Valley, CA on this 7th day of June 2019.

Jeffrey A. Hansen

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 7, 2019, I caused a copy of the foregoing ***Plaintiff's Rule 26(a)(2) Expert Disclosure*** with the ***Written Report of Jeffrey A. Hansen*** to be served upon the following via electronic filing using the CM/ECF system, and caused a copy of ***Exhibits A through AG*** thereto to be served upon the following via Email:

        Mark A. Olthoff (#38572)
        Brisa I. Wolfe (#67028)
        POLSINELLI, P.C.
        900 W. 48th Place, Suite 900
        Kansas City, Missouri 64112-1895
        (816) 753-1000
        (816) 753-1536 (fax)
        molthoff@polsinelli.com
        bwolfe@polsinelli.com

                                  /s/ Theodore H. Kuyper